

NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Honli De Wayne Hale*

**Signed September 1, 2006**                    **United States Bankruptcy Judge**

---

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SYLVAN I-30 ENTERPRISES, d/b/a** | § | **CASE NO. 05-86708-HDH-11** |
| **FLASH MART STORES, FLASH MART,** | § | |
| **INC., SYLVAN TEXACO, BMH** | § | |
| **ARCHITECTS, and QUIZNOS** | § | |
| | § | |
| **DEBTOR.** | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
### CONFIRMATION OF MODIFIED PLAN OF REORGANIZATION

On August 3- 4, 2006 the Court heard confirmation of the Debtor's plan of reorganization and Motiva Enterprises LLC's ("Motiva") motion to show cause related to the Debtor's performance under a cash collateral order. At the close of the hearing, in lieu of closing arguments, the Court allowed the parties to submit post-trial proposed findings of fact and conclusions of law. These were filed by the parties on August 24, 2006.

### <u>Jurisdiction</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A) and (G). The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

## Findings of Fact

1.      Sylvan I-30 Enterprises ("Sylvan" or "Debtor") filed its Chapter 11 bankruptcy petition on October 25, 2005.

2.      Prior to the bankruptcy filing, on February 24, 1999, Sylvan entered into a Credit and Security Agreement (the "Agreement") with Texeco Refining and Marketing, Inc. ("Texeco"), pursuant to which Texeco agreed to loan Sylvan an aggregate principal amount not to exceed $2,400,000.00, for the purpose of financing the construction of a retail gas facility at 1805 Sylvan Avenue, Dallas, Texas.  The Agreement also contained a Program Rate Rider, which contained additional information about the calculation of the interest rate under the Agreement. The loan was secured by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Financing Statement.  Texeco assigned its interests under the Agreement to Citicorp, and after Sylvan defaulted on the loan, Motiva became the holder of the loan.  Motiva is the holder of a properly perfected senior secured lien on substantially all of Sylvan's assets, and holds a claim in this bankruptcy case of at least $1,918,823.00.

3.      Under the Program Rate Rider, Sylvan promised to repay the loan at an adjustable rate.  The adjustable rate is determined by starting with Citicorp's commercial paper rate and adding a spread of 225 basis points.  *See* Motiva Exhibit 47-a.

4.      On March 20, 2006, the Debtor filed its First Amended Plan of Reorganization ("Plan").  On May 19, 2006, the Debtor and Motiva filed an agreed scheduling order for plan confirmation hearing, which required the Debtor to provide Motiva with certain disclosures, and set up certain pre-hearing deadlines.  On July 27, 2006, Motiva filed its objection to confirmation of the Debtor's Plan.  At the confirmation hearing, the Debtor presented its Plan to the Court. The Debtor also presented several modifications to the plan to address the objections to the plan filed by Dallas County ("Dallas"), Tax Ease Funding, L.P. ("Tax Ease") and the Comptroller of Public Accounts ("Comptroller").  *See* Debtor's Exs. G and I .  The only remaining objections to confirmation were those of Motiva.  Motiva was the only creditor not to vote for the plan.  *See*

Debtor's Ex. H.

5.      At the time of the bankruptcy filing the Texas Department of Transportation ("TxDOT") had closed the entrance ramps off of Interstate 30 at the Sylvan Avenue location in Dallas, Texas.  As a result of the closing of the ramps, the Debtor's business was reduced from the prior twelve months.  The Debtor had also fallen behind in the payment of property taxes in 2001, 2002 and 2003 because the City of Dallas backed out of an abatement program with the Debtor.  Subsequent to that time, the Debtor has made its tax payments and paid Tax Ease, the lender that paid off the unabated taxes for the Debtor.  In November 2005, the Debtor's business had severely deteriorated.  The Debtor had managed to keep the business operating during the road construction for the two years prior to the filing.  The closing of the ramps and the corresponding loss of income led to the filing.

6.      Recently, Debtor's operations have improved.  In fact, the Debtor's current operations are closer to the Debtor's operations in 2004 prior to closing of the ramps off of I-30. *See*, Motiva's Ex. 57 and Debtor's Ex. C.

7.      According to the Debtor, the Debtor's property is worth $2,200,000.  Thus, Motiva's claim is fully secured in the approximate amount of $1,950,000.

### *The Debtor's Modifications to the Plan*

8.      The Debtor's First Modification provides the following:

Class 6 – Executory and Leases.  The Debtor is rejecting the  Burton Oil Fuel Supply Contract ("Burton").  In order to improve the terms with Burton, the Debtor is entering into a new fuel contract with Burton as part of this plan with a ten-day pay and one-cent over rack price with a new ten year term and 1% rebate for four years (valued at $230,000).  In exchange for the execution of the new contract, Burton shall assert no rejection claim against the Debtor and the Debtor and Equity Holders agree to pledge all shares of stock in the Debtor to Burton to secure the repayment obligations under the new contract. In the event of a default and should Burton foreclose on the stock, Burton will be bound by the terms of the plan as though it was an original equity interest holder at the time of confirmation. The Class 6 Claimant is

impaired under this plan and is entitled to vote on the Plan.

          Class 8 – Equity Interests.  On the confirmation date, all equity interests shall be retained and shall be pledged as set forth herein to Burton.  The unsecured creditors have voted to support the Plan.

     9.     The Dallas modification provides the following:  Notwithstanding anything in the Debtor's First Amended Plan of Reorganization and/or subsequent plan (the "Plan") to the contrary, Dallas will be excluded from section 9.03(a) and section 9.03(c).  Section 401 is amended to provide that the 2006 post-petition ad valorem property taxes are a liability incurred by the Debtor in the ordinary course of business that will be paid in the ordinary course of business, without the necessity of Dallas filing a request for payment of these taxes as an administrative expense of the state.  Dallas' secured claim will be allowed in the amount of $33,772.42, and the section 506(b) interest in the amount of $2,683.26, for a total allowed claim of $36,455.60. The claim will be paid in full within sixty months, with interest at the rate of 12% per annum from the petition date through the affective date and 12% per annum thereafter.

     10.     The Tax Ease modification provides the following:  The allowed Tax Ease secured claim shall be treated as follows:  The allowed secured claim of Tax Ease (the "Tax Ease Claim") shall be repaid in monthly payments by the Debtor in fifteen years following the plan effective date.  The Tax Ease Claim shall bear interest at the rate of 13% per annum (compounded daily) for years 1 through 3 following the effective date, and 12% per annum (compounded daily) for years 4 through 15 following the effective date.  The Debtor's monthly payment to Tax Ease shall be (I) an amount equal to 1% of the Tax Ease Claim for months 1 - 36 following the plan effective date; and (ii) an amount equal to that necessary to amortize the principal and interest remaining at the end of month 36 over the remaining 144 months in equal monthly installments, for months 37 - 180.  The Debtor shall timely pay all ad valorem tax liens on the property, subject to Tax Ease's liens, arising on or after January 1, 2006.  The Debtor shall not enter into any subsequent transactions pursuant to Texas Prop. Code 32.06 which affect the property subject to

Tax Ease's liens without Tax Ease's consent. The Debtor shall not suffer any lien which is senior to or *pari passu* with the liens of Tax Ease to exist on the property subject to Tax Ease's liens, save and except those ad valorem liens of taxing authorities which are not yet due and payable. The Debtor stipulates that the Tax Ease Claim shall accrue contract interest through the effective date of the plan. Tax Ease shall retain its liens and the priority thereof to secure repayment of the Tax Ease Claim. Both the Debtor and Tax Ease reserve any and all rights regarding the amount of the Tax Ease Claim, including what constitutes reasonable fees under 11 U.S.C. § 506(b). Any dispute shall be resolved in accordance with the claim objection procedure, if any, identified in the plan.

11. The Comptroller's modification provides the following: Notwithstanding anything in the Debtor's Plan to the contrary, all post-petition tax liability owed to the Comptroller, or the Texas Workforce Commission ("TWC"), including applicable interest and penalties, will be paid in full on or before the Plan's effective date. Neither the Comptroller, nor TWC, will be required to file any pleading in this bankruptcy case as a condition of payment. The Debtor's failure to timely pay any post-petition tax liability owed to the Comptroller or TWC shall be an event of default under the Plan. Notwithstanding anything in the Plan to the contrary, the Comptroller's secured tax claim in the amount of $17,875.82 will be treated as follows: The Comptroller's tax claim shall be paid in full within sixty months of the Debtor's bankruptcy petition date, October 25, 2005 ("Bankruptcy Petition Date"). Payments shall be in monthly installments of principal and accrued interest. The first installment is due within thirty days of the Plan's effective date. The Comptroller's secured tax claim shall accrue interest at the rate of 6.25% per annum from the Debtor's Bankruptcy Petition Date through December 31, 2005. Thereafter, the Comptroller's claim shall accrue interest at the rate of 8.25% per annum until paid. The Comptroller shall retain its statutory tax liens until all payments are made pursuant to the Plan. Notwithstanding anything in the Plan to the contrary, TWC's priority tax claim in the amount of $2,475.74 will be treated as follows: The TWC's priority tax claim shall be paid in full within sixty months of the Debtor's

Bankruptcy Petition Date. Payments shall be in monthly installments of principal and accrued interest. The first installment is due within thirty days of the Plan's effective date. The TWC's priority tax claim shall accrue interest at the rate of 18% per annum from the Plan's effective date until paid in full. A failure by the reorganized Debtor to make a payment to the Comptroller or TWC, pursuant to these terms, shall be an event of default. If the reorganized Debtor fails to cure an event of default, as to the Comptroller or TWC, within ten days after service of a written notice of default, then the Comptroller or TWC may (a) enforce the entire amount of its claim, (b) exercise any and all rights and remedies under applicable non-bankruptcy law, and (c) seek such relief as may be appropriate in this Court. Debtor shall be allowed to cure up to two defaults. Upon a third default, the Comptroller or TWC, may declare the default non-curable and proceed to collect the remainder of the debt.

12. During the confirmation hearing, the Debtor tendered another modification to address the secured claim of Motiva. The Third Modification reads as follows:

Class 3 – Motiva Secured Claim. The Motiva Secured Claim shall be treated as follows:

(a) Allowance of Claim and Treatment. The Motiva Secured Claim shall be paid its full unpaid principal balance and interest, estimated at $1,918,823, at the rate of 7.55 % per annum over fifteen years, which is $17,842.29 per month. The Debtor will pay principal and interest on a monthly basis to Motiva commencing on September 1, 2006, in equal installments of principal and interest. In addition to the monthly payment of principal and interest to Motiva, called for by the Plan as set forth herein, Debtor shall pay to Motiva the excess amount from any lease the Debtor executes for the Quizno's space. The excess amount shall be applied first to principal and then to the accrued interest on the allowed Motiva Secured Claim, if any. The excess amount shall be calculated as follows: Any amount over $4,000 per month for the restaurant space, the average of the Quizno's net income currently being received by the Debtor.

(b) Liens. Motiva shall retain its liens as set forth in its loan documents with the

Debtor. The $50,000 contributed by Hamid Rezaie shall serve as additional collateral for the claim of Motiva, and shall remain in place for so long as a balance to Motiva is outstanding under this Plan. The $50,000 shall be held in a separate segregated account.

(c)     <u>General Treatment</u>.  The Plan does not alter Motiva's existing loan documents and liens, except as modified above.

(d)     The Class 3 Claimant is impaired under this Plan, and is entitled to vote on the Plan.

<u>Class 8 – Equity Interests</u>.  On the Confirmation Date, all equity interests shall be retained and shall be pledged as set forth herein to Burton.  Hamid Rezaie shall become the sole equity interest holder in the Debtor, and all interests of the other equity interest holder shall be cancelled. In exchange for acquiring complete ownership in the Debtor, Hamid Rezaie shall contribute $50,000 to the Debtor prior to the entry of a confirmation order in this case.  The $50,000 shall only be used to cover shortfalls, if any, in the payments to be made to Motiva under this Plan. The $50,000 shall serve as additional collateral for the claim of Motiva, and shall remain in place for so long as a balance to Motiva is outstanding under this Plan. The unsecured creditors have voted to support the Plan.

### Motiva's Objections to Confirmation

13.     The Court was presented with three objections by Motiva at the hearing.  First, the appropriate interest rate for the payment of Motiva's secured claim. Second, the appropriateness of the Debtor's accounting and efforts to correct an error in the true-up amounts to be paid to Motiva. Third, the feasibility of the Debtor's plan, as modified.

14.     The loan between Motiva and the Debtor provided for an adjustable rate of interest tied to Citicorp's commercial paper rate by taking that rate and adding a spread of 225 basis points.  The Citicorp commercial paper rate is determined by Citicorp under the Agreement.  *See* Motiva Exhibit 47-a.  As of the confirmation hearing, that rate was 8.19%.[1]  The Debtor has

---

[1] The Citicorp  commercial paper rate as of the confirmation hearing was 5.94%.

offered to use a 7.55% rate on the repayment of Motiva's Secured Claim. The Debtor had originally proposed a rate of 6.5% but agreed to the higher rate prior to the confirmation hearing.

15.       Motiva offered Kevin Morley a witness on interest rates from Citigroup. Such witness clearly indicated that the marketplace for convenience store and gas station loans does not base such loans on the prime rate of interest. The rates for the type of loan that the Debtor had on its store is not a prime based rate. Rather, such loans are generally made on a variable rate tied to a commercial paper rate or a LIBOR rate. In this case the contract rate is a variable rate tied to the Citicorp commercial paper rate plus 2.25%. This rate is adjusted on the 26th day of the prior month.

16.       The Debtor's principal, Saeed Mahboubi, retained Samir Patel to audit the Debtor's use of cash collateral and the payments required under the cash collateral orders in this case. Mr. Patel, a licensed certified public accountant, familiar with bankruptcy monthly operating reports and cash collateral orders, testified that the provision included in the cash collateral order for computation of the amount to be paid to Motiva at month end was extremely confusing. Mr. Patel reviewed the Debtor's payments of cash collateral to Motiva back to the beginning of the case. The Debtor made an error in the month of April by offsetting the loss of a previous month, when it had paid future cash collateral payments. The cash collateral payment does not allow for those kinds of offsets. Mr. Patel testified that the loss in April was the result of three payrolls being paid in that month. Mr. Patel testified that by replacing the negative for April with a zero there was an amount of $6,825 due to Motiva. The Debtor's mistake was an accounting error. Accordingly, the Debtor's error in the payment of cash collateral to Motiva at the end of May 2006 appears to have been an honest mistake, which the Debtor claims to have cured by paying $6,825 to Motiva. Confirmation of the Plan will result in the full amount of Motiva's claim being paid over the life of the Plan, making any further cash collateral true-up irrelevant.

17.   The Debtor has used two different types of reporting in this case. The Debtor has used the U.S. Trustee format of monthly operating reports, as well as internal income and expense reporting. The monthly operating reports contain the same information as is in the income and expense statements, but is presented in a different format with different labels for expense and income items.

18.   The Debtor's principals have been involved in other Chapter 11 bankruptcy cases, but they have not had their properties foreclosed out of the bankruptcy cases. The track record in such cases indicates that the principals have been able to retain the properties and work out agreements with the creditors.

19.   The Debtor has other income in addition to the cost of goods sold. Such other income includes $2,429 in rebates and $3,000 in phone cards, ATM online charges, pay phone, air and water, leases (taqueria and check cashing) and other non-sales income. This $5,400 adds to the total income realized. The Debtor's total income is higher than the Debtor's net sales income. These numbers were not considered by Mr. Gregory, Motiva's expert, in his margin calculations. The Debtor's projections are based on total income and tend to show the Debtor's plan is feasible.

20.   The Debtor paid Motiva $15,925 in the month of July 2006, pursuant to the cash collateral order.

21.   Although close, the Debtor's projections indicate the ability of the Debtor to make payments to Motiva in the range of $16,000-$20,000 per month. The Debtor believes it will outperform its own projections starting in the month of July 2006. Such operation would be consistent with the Debtor's performance in 2004 when the Debtor was servicing the debt to Motiva each month. Motiva's Ex. 57. During the history of its loan, the Debtor has made payments as high as $24,000, and as low as $14,000 to Motiva, based on the variable rate loan.

22.   The Debtor showed that, based on current income, it should be able to make the required payments. To the extent that there is a question about the feasibility of the Plan, the

Debtor obtained a $50,000 additional deposit to provide for payments to Motiva.

23.    The Debtor is proposing to pay equal monthly payments of principal and interest to Motiva commencing on September 1, 2006.

24.    Hamid Rezaie has also committed $50,000 towards the payment of Motiva's secured claim in exchange for the acquisition of Saeed Mahboubi's interest in the Debtor.  That money has been put in a separate account to provide for payments to Motiva.  The Debtor will also contribute any money that would go to other classes of creditors to Motiva after the various classes of creditors are paid off.  These commitments by the Debtor could result in the Motiva debt being retired much quicker than the proposed plan term.  These proposals were embodied in a Plan modification filed by the Debtor prior to the conclusion of the confirmation hearing.

25.    It is the best interest of all the creditors and equity interest holders in this case that a plan be approved and to give the Debtor a chance to perform under the Plan.

## Conclusions of Law

### Motiva's Feasibility Objection

1.      Motiva objects to the feasibility of the Debtor's plan.  Section 1129(a) of the Bankruptcy Code addresses the requirements for plan confirmation under Chapter 11.  The so called "feasibility" requirement, found at Section 1129(a)(11), dictates that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor of the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

2.      Similar to the other requirements for confirmation, feasability need only be proven by a preponderance of the evidence. *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th  Cir. 1997); *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993).

3.      Based on the Debtor's projections, the Debtor has the ability to make payments to Motiva in the range of $16,000-$20,000 per month.  The Debtor believes it will outperform its own projections starting in the month of July 2006.   Such operation would be consistent with the Debtor's performance in 2004 when the Debtor was servicing the debt to Motiva each month.  Motiva's Ex. 57.  During the history of its loan, the Debtor has made payments as high as $24,000, and as low as $14,000 to Motiva, based on the variable rate loan.  As stated in the findings of fact, he Debtor showed at the confirmation hearing that, based on current income, it should be able to make the required payments.  To the extent that there is a question about the feasibility of the Plan, the Debtor obtained a $50,000 additional deposit to provide for payments to Motiva.  The Plan complies with section 1129(a)(11) of the Bankruptcy Code.

### *Motiva's Objection to the Interest Rate Provided on its Claim*

4.      Because the Plan has not been accepted by each impaired Class of Claims, the cramdown provisions of subsection (b)(2)(A) are applicable. Under these provisions, the Debtors' Plan cannot be confirmed or "crammed down" over the objection of Motiva unless the plan is found to be "fair and equitable" as to Motiva. As to what would be "fair and equitable" to a secured creditor, Section 1129(b)(2) provides, in pertinent part:

> For purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides–
> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(b)(2).

5.      Motiva objects to the interest rate provided under the Plan. To be "fair and equitable," the Debtor must provide payments over the life of the Plan equal to the present value of the secured claim of Motiva. 11 U.S.C. §§ 1129(a)(7), 1129(b)(2)(B), and 502(b).

6.      In determining the appropriate interest rate to be applied to allowed secured claims under a plan of reorganization, the Supreme Court has expressly rejected the "presumption" that the contract rate is the appropriate interest rate. *Till v. S.C.S. Credit Corp.*, 541 U.S. 465, 477 (2004). The Supreme Court's decision in *Till* addressed the proper rate of interest required to be used with regard to payments to secured creditors on a cram down loan under a proposed Chapter 13 plan. However, the *Till* decision, while helpful, may be inapplicable in a Chapter 11 case. *See Till*, 541 U.S. at 476 n. 14. In a footnote, the Supreme Court expressly stated that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id*. The selection of an interest rate for a claim that recognizes the realities of the various transactions entered into by the Debtor is consistent with such

approach.  *See, In re Mirant Corporation,* 332 B.R. 139, 158 n. 53 (Bankr. N.D. Tex. 2005).  In this case there is no evidence that the risk of non-payment or non-performance is any greater now then it was when the loan was made. The uncontroverted testimony was that Motiva's collateral is much greater in value then the amount of its debt. In fact the current operations are mirroring those in 2004 when Motiva was satisfied with less than a 5% rate of interest.  The interest rate required of the Debtor prepetition is a fair measure of the market's assessment of the risk associated with dealing with the Debtor.  *See Mirant*, 332 B.R. at 158.  The Court finds that the variable rate in the Agreement and related loan documents provides present value for Motiva. Thus, the variable interest rate provided in the Agreement is the appropriate rate for the payment of Motiva's secured claim.

7.      Since all the unsecured creditor classes voted for the Plan, there is no absolute priority rule violation in this case. Debtor's Ex. H.  The Plan complies with the provisions of § 1129.

### *Motiva's Motion for Contempt Under the Cash Collateral Order*

8.      There is no reason to dismiss this case based on the Debtor's mistake in making payments of cash collateral to Motiva.  The Debtor did not purposely fail to comply with a Court order; rather, its calculations were disputed and adjusted to correct an error in the cash collateral payments made to Motiva.  The Debtor made the cash collateral payments to Motiva, just in the wrong amount. The Debtor is not in contempt.

### Conclusion

9.      In conclusion, the Plan shall be confirmed, with conditions.  The interest rate shall be the variable rate provided in the Agreement and associated loan documents, and payments shall commence on September 1, 2006.  The $50,000 shall be held in a segregated account and be used only to supplement the payments to Motiva, as necessary, and may not be used or withdrawn for any other purpose.  As additional protection to Motiva, should Debtor default on any payment obligation to Motiva, and remain in default for five days thereafter, the stay and any

Plan injunction shall lift without further order of the Court, and Motiva may exercise its rights

under state law.

10.    Any finding of fact may be considered a conclusion of law and visa versa.

11.    Debtor's counsel shall prepare an order confirming the Plan commensurate with these findings and conclusions, and submit same within ten days of entry of these findings and conclusions.

###End of Findings and Conclusions###